# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SENIOR PARTNER, INC., AS TRUSTEE OF THE ARDYTHE HOPE CHILDREN'S HOSPITAL, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2020-0226-SEM |
| DAVID L. LEE, | ) ) | |
| Defendant. | ) | |

## MASTER'S FINAL REPORT

Final Report: November 28, 2022
Draft Report: August 31, 2022
Date Submitted: May 5, 2022

Jason C. Powell and Thomas Reichert, THE POWELL FIRM, LLC, Wilmington, Delaware; *Counsel for Plaintiff.*

Anthony Delcollo, Christopher J. Isaac, and Frank E. Noyes, II, OFFIT KURMAN, P.A., Wilmington, Delaware; *Counsel for Defendant*.

**MOLINA, M.**

In this breach of fiduciary duty action, the former fiduciary agreed to prepare "a detailed, itemized accounting" of how he handled trust assets. Unfortunately, he could not account for a large portion of the funds he controlled and concedes he should repay the trust for $247,256.97 in unsupported expenditures. He argues, however, that the judgment should be reduced to reflect appreciation on real property he purchased with trust funds (bringing the repayment down to $165,738.47). The current fiduciary argues there is no basis for a credit for appreciation and the unaccounted-for expenditures is much higher; as such, the current fiduciary seeks judgment against the former fiduciary in the amount of $376,531.43.

With the parties unable to agree on the amount due to the trust, the accounting was presented for my consideration at an evidentiary hearing, during which the former fiduciary testified about his handling of the assets and preparation of the accounting. After careful consideration of the evidence presented, I find the defendant owes the trust $366,412.34 and judgment should be entered against him as explained herein. I further recommend the real property be deeded to the trust and the former fiduciary vacate such property within one year of this report becoming an order of the Court. The former fiduciary should also be required to

return any assets remaining in his possession to the current trustee. This is my final report.[1]

## I. BACKGROUND[2]

This dispute arises out of the Ardythe Hope Children's Trust (the "Trust"). Ardythe Hope (the "Decedent") was a senior firefighter with the City of Wilmington, who was injured in the line of duty on September 24, 2016.[3] She succumbed to her injuries December 1, 2016, leaving behind three (3) daughters: Aryelle Hope, Alexis D. Lee, and Ardavia D. Lee.[4]

After her death, the Decedent's two minor daughters, Alexis and Ardavia Lee (together, the "Beneficiaries"), moved in with their father, David Lee (the "Defendant").[5] But the Defendant was not without financial support in caring for

---

[1] This final report makes the same findings and recommendations as my August 31, 2022 draft report, to which exceptions were filed. Docket Item ("D.I.") 54, 55. The exceptions are addressed in footnotes where appropriate; as explained herein, I find they should be overruled and denied.

[2] The facts in this report reflect my findings based on the record developed on February 16, 2022. *See* D.I. 47. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcript, D.I. 47, are in the form "Tr. #." The Plaintiff's exhibits 1-14 are cited as "PX __." The Defendant's exhibits 1-2 are cited as "DX __." The Defendant indicated an interest in submitting additional evidence, which I denied explaining "today was the evidentiary hearing to discuss the accounting and any supporting documentation or invoices. The record is now closed." Tr. 174:12-14.

[3] PX 10 p. 1.

[4] *Id.*

[5] *Id.* Although her loss was no less tragic, Aryelle Hope was already an adult when the Decedent passed. D.I. 1 ¶ 5. Currently, the Beneficiaries are both over eighteen years old, but the Plaintiff remains their fiduciary and trustee. *See* Tr. 34:21-24. Notably, the Trust

the Beneficiaries, now as a single parent; the Beneficiaries began receiving benefits from their mother's passing in 2017.

## A. The Benefits

With the Decedent's death, the Beneficiaries were entitled to their share of benefits from the federal Public Safety Officers Benefit Office (the "PSO benefits"), lost wages from the City (the "PMA benefits"), and the Decedent's pension (the "Pension benefit," collectively, with the PSO benefits and the PMA benefits, the "Benefits").[6]

On July 26, 2017, the PSO benefits were confirmed for a total of $343,589.00.[7] But, the Defendant received only $323,922.67.[8] The Defendant admitted the PSO benefits were reduced due to the Defendant's personal tax

---

does not terminate upon them reaching the age of majority, but rather begins a winddown process when the youngest of the Beneficiaries reaches the age of 22. D.I. 1, Ex. A §3.B. The Trust should be fully distributed once the youngest of the Beneficiaries reaches the age of 35. *Id.*

I would be remiss not to acknowledge the triumphs and successes of the Beneficiaries. When this matter was heard, the Beneficiaries were both in college, with Alexis on a full volleyball scholarship at Maryland Eastern Shore and Ardavia studying political science and pre-law at Delaware State University. Tr. 126:12-127:23. Their perseverance, drive, and determination in the face of tragedy is inspiring. *See, e.g.*, Tr. 126:12-128:11 (explaining that not only is Alexis on a volleyball scholarship but that she was All-State in basketball and track and field, and that Ardavia was Delaware's Boys and Girls Club Youth of the Year and awarded a Sallie Mae scholarship).

[6] PX 10 p. 3-4.

[7] PX 9.

[8] Tr. 107:12-14.

obligations.[9]  Unlike the lump sum PSO benefits, the PMA benefits of $1,378.90

were delivered monthly, beginning in January 2017, via paper checks.[10]  Altogether

the PMA benefits totaled $149,709.00, but the Defendant contends he only

controlled $122,722.10 (a discrepancy of $26,986.90).[11]  Finally, the Pension benefit

totaled $103,879.36 for the relevant time.[12]

## B.  The Trust

The Defendant received the Benefits as the father and guardian *ad litem* for

the Beneficiaries and, on January 5, 2017, established the Trust on their behalf.[13]

The Trust expressly provides:

> Trustor established this Trust for the benefit of the Children of Ardythe
> Denise Lee, who survived their mother after her passing on December
> 2, 2016 as a result of injuries sustained in the line of duty.  Any Trustee
> serving hereunder shall keep in mind that it is Trustor's primary desire
> that the assets held in the Trust Fund be available for the sole benefit of
> the Children during their lifetimes[.][14]

---

[9] Tr. 107:17-108:8.

[10] *See* Tr. 38:19-39:5; PX 8. While the Beneficiaries were minors, the Defendant handled the Benefits, but the Defendant testified that once the Beneficiaries reached the age of majority, the checks were deposited into their personal accounts or send to them via CashApp. Tr. 35:4-37:1.

[11] *See, e.g.*, D.I. 51 p. 9.

[12] Tr. 99:12-16. *See also* PX 7 (reflecting one monthly payment); D.I. 52 p. 7 (identifying the parties' agreement). A portion of the Pension benefit remains untouched in an account in the name of the Trust. *Infra* n.45.

[13] PX 10 p. 1.

[14] D.I. 1, Ex. A §1. "The Children" is defined in the Trust to mean the Beneficiaries. *Id.* §19.

The Trust further provides, "[a]ny individual Trustee serving hereunder shall be not be [*sic*] entitled to compensation for his or her services as Trustee, but shall be entitled to reimbursement for out-of-pocket expenses incurred in administering this Trust."[15]

Fully aware of this charge and limitation as the trustor, the Defendant appointed himself as the trustee and managed the Trust and the Benefits until he was removed from that position and replaced with Senior Partner, Inc. (the "Plaintiff").[16] Through this action, the Plaintiff challenges the Defendant's use of the Benefits and the Trust. The Plaintiff further avers that the Defendant continued to hold funds belonging to the Trust in multiple accounts and continued to make expenditures on behalf of the Beneficiaries after his removal.[17]

## C.    The Property

Among these expenditures was the purchase of a house at 113 Buena Vista Drive, New Castle (the "Property"), on July 30, 2018.[18] The Defendant made the down payment of $52,278.21, using the Benefits he received on behalf of the

---

[15] *Id.* §16.

[16] PX 10 p. 1. The Defendant testified that the Plaintiff's involvement was a resolution to a guardianship action initiated by a family member of the Beneficiaries, who accused the Defendant of "pocketing money or whatever the case may be." Tr. 43:21-44:16.

[17] PX 10 p. 4-8.

[18] Tr. 87:7-9.

Beneficiaries.[19]  Before the Defendant purchased the Property, he and the Beneficiaries lived in his home in New Castle, Delaware.[20]  But the home was too small and he was concerned about the Beneficiaries' safety and ability to live comfortably.[21]  But, although the Defendant represents the Property as the family home, the Defendant has been the primary resident, with the Beneficiaries both away at college.[22]  Nonetheless, the Defendant used the Benefits and assets of the Trust to cover the full amount of the household expenses for the Property.[23]

### D.    Procedural History

The Plaintiff filed the underlying complaint on March 26, 2020.[24]  The Plaintiff pled two claims: (1) the Defendant unjustly enriched himself with the Trust funds and (2) the Defendant breached his fiduciary duties as trustee.[25]  To remedy the harm from these claims, the Plaintiff asked for (1) imposition of a constructive

---

[19] PX 10 p. 9. *See also* D.I. 51 p. 18. The Plaintiff points to the Accounting (as defined herein), which identifies both $51,278.21 and $52,278.21 as the down payment amount. *See* PX 10 p. 9. I accept the latter as the claimed down payment based on the Defendant's testimony.  Tr. 115:19:116-16.

[20] Tr. 87:10-14.

[21] Tr. 87:15-88:14.

[22] *See* Tr. 92:9-12, Tr. 128:24-129:3, Tr. 140:3-142:19. *See also* Tr. 129:4-22 (explaining other temporary residents in the Property).

[23] Tr. 64:15-20; Tr. 130:5-20. Although the Defendant initially testified that he made utility and other payments toward the Property, he clarified he did so with the Benefits. *Compare* Tr. 92:24-93:2 *with* Tr. 130:5-20.

[24] D.I. 1.

[25] *Id.*

6

trust, (2) an accounting by the Defendant to determine how he used the Trust funds, (3) judgment against the Defendant for any misused or misappropriated funds, and (4) a lien against any real estate improperly titled.[26] The Defendant filed an answer on May 18, 2020, denying that he acted improperly and raising multiple affirmative defenses.[27]

After the Defendant answered, the docket sat dormant for around nine (9) months. In February 2021, the parties reached out about scheduling and on March 23, 2021, I issued (at the parties' request) a brisk schedule for fact discovery to close in May, expert discovery to close in July, and trial in November.[28] Discovery and pre-trial preparation did not, however, go to plan. In July, the Plaintiff filed a motion to compel discovery responses from the Defendant, which were still outstanding.[29] In early August, the Plaintiff also moved for a protective order to bar discovery served by the Defendant two months after the deadline.[30] On October 15, 2021, after the motions were fully briefed, I granted both and shifted fees in an amount to be determined.[31]

---

[26] *Id.*

[27] D.I. 8.

[28] D.I. 11.

[29] D.I. 17.

[30] D.I. 18.

[31] D.I. 29-30. Those orders were final reports and the stay on exceptions was lifted when my draft report was issued; no exceptions were filed to those orders.

Shortly after my discovery rulings, on October 29, 2021, the parties reached a "tentative agreement" to resolve this matter.[32] The resolution was submitted through a stipulation and proposed order, wherein the parties agreed that (1) the Defendant would complete an accounting, (2) the parties would meet and confer to review the accounting, (3) the Defendant waived his affirmative defenses, (4) the Defendant would transfer ownership of the Property to the Beneficiaries, and (5) the Plaintiff may apply to the Court for reimbursement of costs and attorneys' fees in the amount of $2,750.00 in connection with the Plaintiff's discovery motions.[33]

Through their stipulation, the parties proposed two options for resolution. If the parties reached an agreement, the parties would enter into a stipulation to be submitted to the Court as a consent judgment, under which the Defendant would reimburse the Trust for any "short fall" between the Trust funds received by the Defendant and expenses paid for the Beneficiaries.[34] If the parties failed to reach an agreement, the parties agreed to a "fact finding hearing" to allow the Court to make determinations regarding any disputed expenses.[35] After a status conference on November 1, 2021, I approved the stipulation and proposed order on November 9,

---

[32] D.I. 31.

[33] D.I. 32.

[34] *Id.* ¶4.

[35] *Id.* ¶5.

2021 (the "Order").[36]  In the Order, I tentatively scheduled the fact-finding hearing, if necessary, for February 16, 2022 (the "Hearing").[37]

The parties advised on January 20, 2022 that disputes remained, and the Hearing was necessary.[38]  As set forth in the Order, the Hearing was meant to be "a fact finding hearing limited to a determination as to the disputed expenses . . . . Any evidentiary presentation at the Hearing [was to] be limited to the Accounting and supporting testimony of the Defendant as to the sufficiency and further explanation/justification of the Accounting."[39]  Thus, the Plaintiff's witness list, which included a proposed expert witness, raised concerns.  But, after discussion during the Hearing, I accepted a proffer regarding the expert's testimony and admitted his report into evidence.[40]

The Hearing permitted a deep dive into the Defendant's accounting, which he served on the Plaintiff on December 15, 2021 (the "Accounting").[41]  The Accounting

---

[36] *See* D.I. 33; D.I. 34.

[37] D.I. 34.

[38] D.I. 35. The Hearing was held on the Zoom platform; relevant instructions were provided, and a record has been retained for *de novo* review, if necessary. *See* D.I. 37, 47.

[39] D.I. 34.

[40] *See* Tr. 152:16-159:11, 166:20-167:3; PX 13.

[41] PX 10. The Accounting was complicated by the Defendant's use of numerous different accounts, both concurrently and serially, with assets being transferred from one account to another, and accounts being opened and closed during the accounting period. *See, e.g.*, Tr. 47:15-17 (explaining "[i]t was three different accounts for each girl, and then it was two other accounts for [the Defendant]"). This report does not address how the funds were held,

begins with a "background" section, which contains explanations and commentary which I do not accept for the truth of the matters asserted.[42]  The Accounting then explains the three sources of income and the various accounts the Defendant utilized.[43]  It ends with a summary, totaling the income, expenditures, and other items for consideration, and attaches exhibits A-D, which include the itemized expenditures, transfers, and the estimated value of the Property.[44]

In addition to the Accounting, the Defendant served two supplements on January 7, 2022 and January 22, 2022 (collectively, the "Supplements").[45]  The Supplements clarified the cash transfers and payments to the Beneficiaries.

The Defendant further disclosed that funds totaling $14,392.71 remain in a WSFS bank account, which is titled in the name of the Trust (the "WSFS Account").[46]  The Defendant has declined to account for the WSFS Account, arguing the funds were never expended or withdrawn by the Defendant; as such, there is

---

or the historical transfers, but rather deals in absolutes—how much money came in (or should have come in), how much went out, and what the Defendant can support.

[42] PX 10 p. 1-3.  Rather, I rely on the Defendant's testimony at the Hearing.

[43] *Id.* p. 3-8.

[44] PX 10.  *See also* DX 1-2 (supporting documentation).

[45] PX 11-12; Tr. 24:15-19.

[46] PX 10 p. 9. Who controls or has the ability to control the WSFS Account is unclear; there appears to be no dispute, however, that the funds in the WSFS Account should be under the stewardship of the Plaintiff.  *See* D.I. 52 p. 7.

nothing for which he needs to account. But he seeks a credit for those remaining funds, reducing his debt to the Trust.

Through the Accounting, which was supported by the Defendant's testimony, the Defendant claims a total of $244,144.85 in general expenditures for the benefit of the Beneficiaries.[47] These general expenditures included purchases of clothing, food, technology, and other things for the Beneficiaries.[48] They also included groceries and meals for the Beneficiaries and the Defendant together, and household expenses that benefitted all residents of the Property.[49] The Defendant also testified that he threw a "Sweet 16" party for one of the Beneficiaries, using the Benefits, which cost more than $5,000.00.[50] In addition to the general expenditures, the Defendant identified electronic cash transfers to the Beneficiaries, including $8,669.72 in direct transfers to the Beneficiaries and $3,448.00 in CashApp payments to the Beneficiaries, for a total of $12,117.72.[51] The Plaintiff agrees that

---

[47] PX 10 p. 9. At the Hearing, the Defendant explained how he created the Accounting and his list of expenditures. *See, e.g.*, Tr. 49:4-13, Tr. 49:20-23, Tr 124:2-11.

[48] PX 10 p. 9.

[49] *See, e.g.*, Tr. 56:15-22. *See, e.g.*, Tr. 64:15-20, Tr. 124:15-21. *See also* Tr. 129:4-22 (explaining other temporary residents in the Property).

[50] Tr. 70:20-71:11.

[51] PX 10 p. 9.

these payments should be credited to the Defendant as appropriately expended for the benefit of the Beneficiaries.[52]

But the Accounting and the Supplements left much to be desired. At the Hearing, the Plaintiff identified three (3) remaining issues in dispute: (1) whether the Defendant underreported the Benefits for which he was required to account, (2) whether the expenditures claimed by the Defendant could be accepted on their face and without any supporting documents, such as invoices or receipts, or if an alternative calculation should be made as to reasonable expenses for raising the Beneficiaries, and (3) whether the Defendant should be provided a credit for appreciation on the Property. Based on their positions on disputes, the parties seek judgments more than $200,000.00 apart.[53] And, although the parties agreed that the Property should be transferred to the Trust, they presented differing proposals on how that should be accomplished and the ancillary relief that is necessary and appropriate in connection therewith.

Following the Hearing, the parties were directed to submit closing briefs addressing: (1) the income discrepancy, (2) the supported/unsupported expenditures,

---

[52] D.I. 52 p. 23.

[53] *Compare* D.I. 51 ($165,738.47) *with* D.I. 52 ($376,531.43). I note, the Plaintiff's position on expenditures is a generous one. The Defendant did not provide any receipts or invoices for his expenditures. *See* Tr. 145:13-147:12. The Plaintiff could have latched onto this deficiency and argued that judgment be entered for the full amount. But the Plaintiff took the reasonable and equitable route, which I largely adopt herein.

(3) the Defendant's request for a credit for the Property's appreciation, (4) how the Property should be retitled and ancillary relief necessary and appropriate, and (5) each side's recommended final judgment.[54] Because the Defendant bears the burden of proving he handled the Benefits appropriately, the Defendant was directed to submit his brief first, followed by the Plaintiff.[55] After briefing was complete, I issued my draft report on August 31, 2022, to which the Defendant filed exceptions.[56] This is my final report.

## II. ANALYSIS

This action began as one for unjust enrichment and breach of fiduciary duties. But the parties agreed to streamline their claims and submit the dispute to the Court on a limited evidentiary record, primarily on the Accounting. "An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result."[57] "It is elementary that in this accounting phase, [the Defendant] bears the burden of

---

[54] *See* Tr. 183:14-184:1, 185:13-15.

[55] Tr. 177:17-20.

[56] D.I. 51, 52, 54, 55.

[57] *Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005).

proving both the accuracy of [his] accounting and the propriety of the underlying transactions."[58]

In large part, the Defendant did not meet this burden. But as explained further herein, I find he is entitled to credits and reasonable valuations of the cost of raising the Beneficiaries. As such, I find judgment should be entered in the amount of $366,412.34, representing the unaccounted-for income and expenditures, less appropriate credits, and plus attorneys' fees. I further find the Property should be deeded to the Trust, as explained herein. To reach these conclusions, I separately address the five (5) issues briefed.

### A. The Defendant failed to account for all the Benefits and judgment should be entered against him.

The Defendant agreed—and was required by the Order—to account for all "funds he has received from sources related to the injuries and death of [the Decedent] for the benefit of [the Beneficiaries] . . ., including, but not limited to Public Safety Officers' Award in the gross amount of $343,589.00, bi-weekly lost wage benefit, and payments from the County/Municipal Police Pension."[59]

The parties do not dispute that the Defendant received $103,879.36 from the Pension benefit and that the Defendant must account for the entire $343,589.00 of

---

[58] *Dolby v. Key Box "5" Operatives, Inc.*, 1996 WL 741883, at *1 (Del. Ch. Dec. 17, 1996).
[59] D.I. 34.

the PSO benefits. Because he failed to do so and admitted that the PSO benefits were reduced to pay for his person tax liabilities, judgment should be entered against the Defendant for the amount withheld from the PSO benefits, $19,666.33.

The parties disagree about the amount of the PMA benefits for which the Defendant must account—the Defendant argues he must account for $122,722.10, which is the amount that was deposited into the various accounts, but the Plaintiff argues that the Defendant must account for $149,709.00, which is the full amount the Defendant should have received.

I find the Defendant failed to account for all the PMA benefits and should be held liable for the "missing" funds. It is the Defendant's burden, as the former trustee and fiduciary, to account for how he handled funds directed to his attention for the benefit of the Beneficiaries. The Defendant testified that the PMA benefits were always directed to his, and the Beneficiaries', home. And he testified that he took stewardship over those checks, depositing them and making the funds available to the Beneficiaries. His testimony that certain checks may have been deposited into accounts owned by the Beneficiaries, or otherwise transferred to them in full, lacks any support, is self-serving, and should not be credited.[60] Because of the hands-on, fiduciary role he played, I find the Defendant should be liable for any bi-weekly

---

[60] *See Dweck v. Nasser*, 2012 WL 3194069, at *6 (Del. Ch. Aug. 2, 2012) (holding a fiduciary failed to meet his burden when the accounting could not be connected to "credible documentation" and what was offered was, instead, mere "generalized explanations").

15

payments for which he cannot account. The total amount unaccounted for is $26,986.90 and judgment should be entered against the Defendant for this deficiency.[61]

The Defendant failed to include the entire value of the Benefits in the Accounting and should be held liable for the deficiency in the PSO benefits ($19,666.33) and the PMA benefits ($26,986.90) for a total of $46,653.23. I find this total should be reduced by $14,392.71, to $32,260.52, as a credit for the remaining untouched portion of the Pension benefit in the WSFS Account.[62]

**B.      The Defendant failed to provide support for all claimed expenditures and judgment should be entered against him.**

In addition to accounting for all income received, "the party responsible for rendering an equitable accounting, [has] the burden of coming forward and of proving their expenditures."[63] This burden is "quite demanding" and the Defendant

---

[61] In his exceptions, the Defendant argues that by failing to accept his testimony that he did not receive these funds, I am allowing a windfall to the Beneficiaries or the Plaintiff which is "shocking to the conscience and inconsistent with the equitable principles that serve as a foundation of this Court." D.I. 56. I disagree for the reasons articulated herein and find this exception should be overruled.

[62] The Plaintiff argues that the Defendant should be required to account for $14,392.71 remaining in the WSFS Account, whereas the Defendant seeks a credit against any judgment for this amount of the Pension benefit. I find the Defendant has adequately disclosed the funds within the WSFS Account and no further accounting of such funds is necessary. He should, however, take any and all steps necessary to direct those funds to the Plaintiff and relinquish any control or authority thereover. But I agree that the Defendant should be credited for such remaining funds.

[63] *Dolby*, 1996 WL 741883, at *4 (citations omitted).

16

must prove "both the accuracy of its accounting and the propriety of the underlying transactions."[64] The underlying transactions must be for the sole benefit of the Beneficiaries.[65] An accounting will not be sufficient where "certain listed expenses were not supported by sufficient evidence or appeared to have been inaccurately recorded."[66]

I start with the uncontested matters. The electronic transfers to the Beneficiaries, which total $12,117.72, were appropriate and are hereby approved. Likewise, I accept that the Defendant spent $52,278.21 from the Benefits on the down payment for the Property. The Defendant met his burden of proving these expenditures were for the benefit of the Beneficiaries.

But, otherwise, the Defendant failed. The Accounting is, on its face, deficient.[67] The Defendant claims general expenditures of $244,144.85. But he

---

[64] *Id.* at *1.

[65] *In re DeGroat*, 2020 WL 2078992, at *23 (Del. Ch. Apr. 30, 2020).

[66] *Dolby*, 1996 WL 741883, at *4.

[67] The Defendant failed to keep adequate contemporaneous records and I have concerns about how seriously he took his accounting promise and the Order's directives. To the former, the Defendant testified that he was unaware of the need to keep records of how he was expending the Benefits and handling the Trust's assets. Tr. 135:3-14. Although I am lenient with the Defendant, I cannot fully excuse his failings and I find his professed ignorance that he owed fiduciary duties to the Beneficiaries lacks credibility. *See* Tr. 138:15-19. *See also In re Dougherty*, 2016 WL 4130812, at *12 (Del. Ch. July 22, 2016) (explaining a fiduciary cannot "excuse her own failure to maintain records in a safe place, nor can she rely on a 'narrative' and answers to deposition questions as a substitute for a formal accounting"). Regarding the latter, it is disappointing that the Defendant did not diligently investigate and build a record for the Accounting. *See* Tr. 145:11-147:24.

17

provided no supporting receipts or invoices that the Court could review to determine if the expenditures were for the sole benefit of the Beneficiaries.[68] And many of the expenditures, on their face, clearly benefitted persons other than the Beneficiaries. The Accounting, deficient as it is, reflects that the Defendant failed to treat the Trust assets as solely for the benefit of the Beneficiaries; he routinely used them to fully cover expenses the Beneficiaries shared with others, including himself. Even with the Defendant's testimony, which is self-serving and difficult to believe, the Accounting does not effectively serve its intended purpose.[69]

Despite establishing the Trust, the Defendant failed to take seriously his duties to the Trust and the Beneficiaries. He commingled the Benefits with his personal and business assets, and he used the Benefits to benefit himself. Further, the Defendant used the Benefits to purchase the Property in his own name and continues to assert an unearned interest in the Property. I simply cannot accept the Defendant's testimony that the items listed in his general expenditures were for the benefit of the Beneficiaries.[70] As such, I find the Defendant failed to meet his burden of proof that any of the claimed general expenditures were made for the benefit of the

---

[68] *Cf.* DX 1-2.

[69] And, by the Defendant's own admission, he cannot provide any support for $247,256.97 of the Benefits. *See* D.I. 51.

[70] *See Dweck v. Nasser*, 2012 WL 3194069, at *6 (holding a fiduciary's testimony which "merely offered generalized explanations" or "speculat[ion] about the types of expenditures" was "not sufficient to carry [the fiduciary's] burden").

18

Beneficiaries or are otherwise appropriate. Thus, I find the claimed general expenditures on the Accounting should be rejected.

In crafting the appropriate remedy notwithstanding this rejection, I find *Dolby v. Key Box "5" Operatives, Inc.*, 1996 WL 741883, at *1 (Del. Ch. Dec. 17, 1996) instructive. There, Chancellor Allen also rejected an accounting, finding the defendant "had the opportunity to present an accurate accounting to this Court based on sufficient evidence to meet its burden of proof, but failed to do so, providing primarily largely uncorroborated testimony that was at times difficult to follow."[71] The Chancellor explained the defendant's evidence of payments was "partial, replete with self-dealing, and . . . often suspicious."[72] Unable to rely on the evidence presented by the party with the burden of proof, Chancellor Allen explained that he could use "an alternative method to compute the correct award owed to the plaintiffs" or "[i]nstead of choosing an alternative method, the court may also rely on an accounting provided by the other party if it appears reliable and accurate."[73] Chancellor Allen chose the latter.[74]

Here, like the accounting in *Dolby*, the general expenditures on the Accounting cannot be accepted. But I find I can look to an alternative method to

---

[71] *Dolby*, 1996 WL 741883, at *4.

[72] *Id.*

[73] *Id.*

[74] *Id.*

19

calculate the judgment owed by the Defendant to the Trust. The only options presented to me are to (1) hold the Defendant liable for the full value of the Benefits received and expended or (2) accept the Plaintiff's valuation of $160,000.00 as the reasonable cost for rearing the Beneficiaries.[75] The Defendant provides no other alternative for my consideration.

Equity compels me to accept the Plaintiff's proposal. Initially, I find it would be inequitable to ignore the practical reality that the Defendant was providing for the Beneficiaries as a single parent. It would defy reason to hold, essentially, that none of the Benefits went toward the needs of the Beneficiaries. Of course, some did. But the Defendant has failed to meet his burden to prove how much and for what

---

[75] The Plaintiff also suggested the alternative of reducing the credited general expenditures by one-third (1/3) to account for the portion of benefit the Defendant received from the general expenditures, for a total of $162,763.14. D.I. 52 p. 16. But I find such would not appropriately account for the expenses which solely benefitted the Beneficiaries. *See, e.g.*, PX 10 p. 54 (noting a purchase at Apple, where the Defendant made purchases for the Beneficiaries). Thus, I find myself limited to the above two options.

In his opening brief on exceptions, the Defendant argues that I should have utilized an unspecified alternative method for calculation. D.I. 56. But the Defendant did not proffer one. The closest he gets to doing so is in his reply brief on exceptions. D.I. 59 (arguing: "Due to limited nature of testimony at Hearing, the Defendant believes that in order for this alternative method to [be] accomplished, the Plaintiff should be required to provide Defendant with detailed objections to Defendants December 7, 2021 accounting and all supplements thereto, in order to determine what expenses are disputed by the parties, and allow for the Court to review these objections, along with Defendant's response thereto – and order further evidentiary hearing to any extent necessary – in order to determine if the Defendant has met his burden of demonstrating that expenditures were for the benefit of the beneficiaries."). But parties may not reserve arguments for exceptions, let alone for their reply brief on exceptions; I find this exception should be overruled and the untimely proposed alternative denied.

20

purposes. On the other hand, the Plaintiff was able to quantify a reasonable amount of expenses for such a single parent, through its expert's report, which recommends that $160,000.00 be credited.[76] Presented with either accepting this valuation or entering judgment for the entirety of the Benefits, I chose the former. As such, I find the Defendant should be credited for $160,000.00 of the general expenditures.[77] Judgment should be entered against him for the remaining expenditures—$331,401.82. This brings the recommended judgment, including the unaccounted-for income, to $363,662.34.

---

[76] The report used the IRS's monthly allowable living expenses national standards for a family of three, including expenses for food, housekeeping, clothing, and housing. PX 13. The total expenses ($240,000.00) were reduced by 1/3 to reflect just the Beneficiaries' portion. *Id.*

Through his exceptions, the Defendant argues that I erred in accepting this credit because it "failed to address the Defendant's accounting in any meaningful way, or account for the lifestyle of the trust beneficiaries," and pleads that I should use an alternative method under *Dolby*. D.I. 56. But the Defendant appears to misunderstand my ruling; I chose the alternative method route under *Dolby* and went with the only alternative provided. I did not, as the Defendant appears to represent, accept the credit as a "reliable and accurate" accounting from the Plaintiff. The Plaintiff was not required to submit an accounting, did not submit an accounting, and rather proposed an alternative method, which I accepted. This exception should be overruled and the appeal to a new alternative method denied.

[77] Although I accept this number, I pause to note the rate at which these funds were expended, many through large cash withdrawals, is disappointing and concerning. *See* Tr. 105:23-106:20. The Defendant, as the father of the Beneficiaries, had a duty to support the Beneficiaries and, ideally, the Benefits should have been preserved in large part to support and provide for the Beneficiaries for years in come. *See* 13 *Del. C.* § 503 (a), (c)-(d).

## C. The Defendant should not receive credit for the appreciation in value of the Property.

The parties agree that the Property was purchased with the Benefits and should be titled to reflect the Beneficiaries' or the Trust's ownership. But the Defendant asks that any judgment against him related to the unaccounted-for income or unsupported expenditures be offset by the appreciation of the Property since the time of its purchase, which the Defendant calculates as $81,518.50.[78]

The Defendant makes his request under the theory of quantum meruit, which "allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid."[79] But this equitable principle cannot supplant the terms of the Trust, which provide: "[a]ny individual serving hereunder shall be not be [*sic*] entitled to reimbursement for his or her services as Trustee, but shall be entitled to reimbursement for out-of-pocket expenses incurred in administering this Trust."[80] Thus, to the extent the Defendant

---

[78] PX 10 p. 9.

[79] *Petrosky v. Peterson*, 859 A.2d 77, 79 (Del. 2004).

[80] D.I. 1, Ex. A §16. *See Chrysler Corp. v. Airtemp Corp.*, 426 A.2d 845, 854 (Del. Super. 1980) ("If it is determined that the relationship of the parties and the services involved in this claim are the subject of an express contract, the terms of that contract control and there is no occasion to pursue the theory of quantum meruit or contract implied in law.") (citations omitted).

seeks compensation from serving as trustee or *de facto* trustee, his request should be denied.

Further, to the extent the Defendant is arguing he was serving the Property or the Beneficiaries in some other capacity, he has failed to establish that he did so expecting payment and the Beneficiaries or the Trust, on their behalf, should have known he expected payment. And, finally, the Defendant fails to justify why and how appreciation is the appropriate measure of compensation due to him. His request should be denied.

**D.     The Property should be transferred to the Trust.**

The Order provided that the "Defendant will transfer ownership of the [Property] to [the Beneficiaries] as tenants in common, or as remainder interest owners with residency rights, or shall agree to a secured lien in favor of the [T]rust as the parties further discuss and agree, or such other method of transferring ownership, subject to the approval of the Court."[81]

The Parties dispute how this should be accomplished. The Defendant seeks a life estate in the Property and a remainder interest for the Beneficiaries.[82] The Defendant argues that this "would be the least disruptive solution for the parties."[83]

---

[81] D.I. 34 ¶11.

[82] D.I. 51 p. 16-17.

[83] *Id.* p. 17.

In the alternative, the Defendant requests to remain living in the Property for 18 months, to give him time to demonstrate consistent payments on the judgment in this case to qualify for a loan.[84]  The Plaintiff asks that the Defendant be directed to "execute a deed conveying the . . . Property to the Trust" and to "vacate the . . . Property within a year."[85]

The Defendant has no legal argument to justify granting him an interest, such as a life estate, in the Property.  The Property was purchased by assets owed to the Trust, which expressly provides "that it is Trustor's primary desire that the assets held in the Trust Fund be available for the sole benefit of the [Beneficiaries] during their lifetimes[.]"[86]  As such, the Property should be used solely to benefit the Beneficiaries.  This is best accomplished by transferring full ownership of the Property to the Trust.  The Defendant worries the Trust selling the Property would lead the Beneficiaries to live a "nomadic existence[.]"[87]  The Plaintiff, as trustee of the Trust, owes a fiduciary duty to the Beneficiaries; if the Plaintiff determines it is in the Beneficiaries' best interest that the Property not be sold, I expect the Plaintiff will act accordingly.

---

[84] *Id.*

[85] D.I. 52 p. 22.

[86] D.I. 1, Ex. A § 1.

[87] D.I. 51 p. 16.

24

The remaining question is how long the Defendant should be allowed to remain in the Property. The Plaintiff asks that the Defendant vacate within one year; the Defendant seeks an 18-month transition period. I find the one-year period proposed by the Plaintiff is sufficient and appropriate under the circumstances.[88] Thus, I recommend the Defendant be ordered to convey the Property to the Trust and vacate the Property within one year of this report becoming an order of the Court.[89]

### E. Judgment should be entered against the Defendant and in favor of the Trust.

Based on the above findings, judgment should be entered against the Defendant in the total amount of $366,412.34, representing $46,653.23 in missing income, $331,401.82 in unsupported expenditures, and $2,750.00 for attorneys' fees, minus a credit of $14,392.71. Pre-judgment and post-judgment interest should be added to this judgment, compounded quarterly.[90] I find the Defendant should be

---

[88] The Defendant used the Benefits to purchase the Property yet titled the Property in his name. He has since been living in the Property and covering the Property's expenses, in full, with the Benefits. I find it would be inequitable to allow this situation to continue for another eighteen months after this report becomes an order of the Court.

[89] I encourage the Defendant to consider the draft proposed documents submitted by the Plaintiff. PX 14.

[90] *See, e.g.*, *Dweck v. Nasser*, 2012 WL 3194069, at *6 (holding a fiduciary liable for unsupported expenditures on his accounting and granting pre- and post-judgment interest compounded quarterly). *See also Soterion Corp. v. Soteria Mezzanine Corp.*, 2013 WL 869353, at *2 (Del. Ch. Mar. 7, 2013) (explaining that pre- and post-judgment interest is "a matter committed to the Court's discretion," and finding "that quarterly compounding

required to make monthly payments on the judgment and accept the Defendant's proposal for a 360-month period as unopposed.

The Defendant should also be required to hand over control and authority of the WSFS Account to the Plaintiff within thirty (30) days of this report becoming an order of the Court and to work to transfer and vacate the Property as provided herein.

## III. CONCLUSION

For the foregoing reasons, I find the Defendant failed to account for all income owed to the Trust or support all his expenditures as trustee. He should, therefore, be charged with the missing income and his unsupported expenditures. In fairness, I will, however, credit the Defendant with the only viable alternative method of calculation before me. Altogether, the Defendant owes the Trust $366,412.34 and judgment should be entered against him as explained herein. Further, the Property should be transferred and vacated as provided herein.

This is my final report and exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*

Master in Chancery

---

is both reasonable to maintain the value of the interest that is awarded and to incentivize payment").

26